# United States Court of Appeals for the Federal Circuit

---

**MAGNOLIA MEDICAL TECHNOLOGIES, INC.,**
*Plaintiff-Appellant*

**v.**

**KURIN, INC.,**
*Defendant-Appellee*

---

2024-2001

---

Appeal from the United States District Court for the District of Delaware in No. 1:19-cv-00097-CFC-CJB, Chief Judge Colm F. Connolly.

---

Decided: March 6, 2026

---

MARK ANDREW PERRY, Weil, Gotshal & Manges LLP, Washington, DC, argued for plaintiff-appellant. Also represented by ROCCO JOSEPH RECCE, New York, NY; MICAH BLOCK, Davis Polk & Wardwell LLC, Redwood City, CA; ASHOK RAMANI, Menlo Park, CA; RODGER D. SMITH, II, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, DC, argued for defendant-appellee. Also represented by ARIELLA BAREL, NICHOLAS P. GROOMBRIDGE, ALLISON PENFIELD, JOSHUA D. REICH, Groombridge, Wu, Baughman & Stone LLP, New York, NY; CATHERINE NYARADY, KRIPA

RAMAN, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY.

————————————

Before LOURIE and HUGHES, *Circuit Judges*, and FREEMAN, *District Judge*.[1]

LOURIE, *Circuit Judge.*

Magnolia Medical Technologies, Inc. ("Magnolia") filed suit in the United States District Court for the District of Delaware, asserting that Kurin, Inc. ("Kurin") infringed claims 1 and 24 of its U.S. Patent 10,039,483 ("the '483 patent") and claims 1, 21, and 48 of its U.S. Patent 9,855,001 ("the '001 patent"). Based on the district court's construction that the claims of the '001 patent contained a means-plus-function term, the parties entered into a stipulation of no infringement as to that patent. *See Magnolia Med. Techs., Inc. v. Kurin, Inc.*, No. 19-cv-00097-CFC-CJB, 2020 WL 2559795 (D. Del. May 20, 2020) ("*Markman Decision*"); J.A. 17759. The case then proceeded to trial solely on the '483 patent. A jury found that Kurin infringed the asserted claims of the '483 patent, but the district court granted Kurin's post-trial motion for judgment as a matter of law ("JMOL") that Kurin did not infringe and entered final judgment in favor of Kurin. *Magnolia Med. Techs., Inc. v. Kurin, Inc.*, No. 19-cv-00097-CFC, 2024 WL 2153134 (D. Del. May 14, 2024) ("*JMOL Decision*"). Because we conclude that the district court did not err in construing the '001 patent as containing a means-plus-function term and granting JMOL of no infringement as to the '483 patent, we affirm.

————————————

[1] Honorable Beth Labson Freeman, District Judge, United States District Court for the Northern District of California, sitting by designation.

BACKGROUND

This case concerns devices designed to improve the accuracy of blood tests.  When diagnosing a patient, healthcare practitioners often collect blood to test for the presence of pathogenic microbes.  '483 patent col. 1, ll. 34–39; '001 patent col. 1, ll. 61–63.  Traditionally, a clinician would draw blood by inserting a needle into a patient's vein, and then test the entire sample collected for microbes.  *See* '483 patent col. 1, ll. 55–61.  This approach, however, had a recurring problem.  Microbes on the skin were often dislodged and transferred into the blood sample collected for testing; such contamination was most likely to occur in the initial portion of collected blood.  '483 patent col. 1, ll. 55–61; '001 patent col. 1, ll. 63–67.  Testing of the entire sample would thus often yield a false-positive microbial test, incorrectly indicating the presence of pathogenic microbes in the patient.  '483 patent col. 1, ll. 63–66; '001 patent col. 1, ll. 63–67.  This would result in the patient receiving unnecessary anti-microbial therapies with potentially deleterious side effects and the actual cause of the symptoms prompting the test going undiagnosed.  '483 patent col. 2, ll. 1–7; '001 patent col. 1, l. 65–col. 2, l. 5.

Magnolia's '483 and '001 patents are directed to devices designed to counter that contamination problem.  '483 patent col. 2, ll. 14–17; '001 patent col. 1, ll. 53–57.  By separating and excluding the initial portion of blood collected from the patient, the patented devices aim to reduce the likelihood that false-positive-causing skin microbes are included in the tested blood sample.  '483 patent col. 3, ll. 25–29.

Independent claim 1 is representative of the '483 patent, and in relevant part recites: "A blood sequestration device, comprising . . . a fluid reservoir disposed in the housing and at least partially defined by *a seal member* . . . and *a vent* . . . configured to allow air to exit the housing as blood enters the fluid reservoir."  '483 patent

col. 20 ll. 48–57 (emphases added).  Independent claim 1 is representative of the '001 patent, and in relevant part recites: "An apparatus for obtaining a bodily fluid sample from a patient with reduced contamination, the apparatus comprising . . . a *diverter* having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient." '001 patent col. 11, ll. 10–32 (emphasis added).

Kurin manufactures and sells the Kurin Lock, a small plastic device incorporated into a typical blood-collection kit that "sequesters the initial draw of blood" and separates it from the rest of the blood collected for testing.  *See* J.A. 27133.  The Kurin Lock's functionality is grounded in the basic principle that fluids—liquids and gasses—generally flow to areas that offer the least resistance, *i.e.*, those at the lowest relative pressure.  A visual representation of how blood flows through the Kurin Lock is depicted below.






J.A. 28834 (stills from video); Resp. Br. at 12–13.

When a medical practitioner inserts a needle into a patient's vein, the difference between the patient's blood pressure and the atmospheric pressure causes blood to enter the Kurin Lock. *See* J.A. 25575. This pressure difference causes blood to flow into the Kurin Lock through the inlet tubing (the tubing labeled at the top of each image). J.A. 25575. As blood enters, it encounters a junction with two separate channels: (1) a sample channel and (2) a U-shaped side channel. *See* J.A. 25641. The sample channel leads to the outlet tubing (the tubing labeled at the bottom of each image), which is at that point sealed. J.A. 25641. The U-shaped side channel terminates at a cap, which contains several structures, including: (1) a porous plug made of absorbent material, and (2) a piece of plastic called an umbrella valve (not depicted in the above images). *See* J.A. 25807. The porous plug, as the name suggests, contains small holes that permit air to flow into the surrounding atmosphere when the porous plug is dry. *See* J.A. 25517.

Initially, the air in the U-shaped side channel can freely pass through the dry porous plug, so the resistance to flow in the U-shaped side channel is less than the resistance to flow in the sealed sample channel. J.A. 24120. Thus, as blood initially enters the inlet tubing, it flows into the U-shaped side channel rather than the sample channel. J.A. 25517; image 2. As blood proceeds through the U-shaped channel, it displaces the air in that channel, which escapes through the porous plug. *See* J.A. 25517.

Blood continues to fill the U-shaped side channel until it contacts the porous plug, causing the material in the porous plug to expand, sealing the pores. J.A. 25516–17; *see* image 3. That expansion is the key feature of the Kurin Lock's functionality. When the pores seal, air cannot reenter the U-shaped side channel and displace the blood back into the junction or inlet tubing, thus causing the blood most likely to contain contaminating skin microbes

to remain in the U-shaped channel. *See* J.A. 25641–42. A clinician then unseals the outlet tubing connected to the sample channel, causing the sample channel to fall to atmospheric pressure. *See* J.A. 25642. As a result, new blood flows solely through the lower pressure sample channel and into a collection bottle. *See* J.A. 25642; image 4. The upshot is that the sample of blood collected is less likely to yield a false positive microbial test result. J.A. 25642.

Crucial to this appeal is the dual functionality of the porous plug. Prior to contact with the patient's blood, the porous plug acts as a "vent." Once its polymeric material expands and its pores shut, it becomes a "seal." In other words, there is only one structure in the Kurin Lock corresponding to two limitations in the asserted claims of the '483 patent—the "vent" and "seal" limitations. J.A. 25574.

Magnolia filed suit against Kurin, asserting infringement of claims 1 and 24 of the '483 patent and claims 1, 21, and 48 of the '001 patent. J.A. 180–81 (original complaint), 331–32 (amended complaint). At claim construction, the parties disputed, *inter alia*, whether the term "diverter," as used in the claims of the '001 patent, should be construed as a means-plus-function term, invoking 35 U.S.C. § 112(f). *See* J.A. 1358–59. The district court concluded that it should be construed as such and thus limited the recited "diverter" to cover only the corresponding structures disclosed in the specification. *Markman Decision* at *3–5. Because the Kurin Lock undisputedly does not meet the "diverter" limitation under the means-plus-function construction adopted by the district court, the parties stipulated to non-infringement as to the '001 patent. *See* J.A. 25–26. The parties did not seek construction of the "vent" and "seal" limitations of the '483 patent.

The case then proceeded to trial solely on the '483 patent. At the conclusion of the four-day trial, the jury found that the Kurin Lock infringed the asserted claims of the '483 patent. J.A. 27–29. Kurin moved for JMOL, arguing,

in relevant part, that the Kurin Lock did not infringe the claims of the '483 patent because it did not contain two separate structures corresponding to the "vent" and "seal" limitations in claim 1.  *See* J.A. 24185–91.  The district court granted the motion.  *JMOL Decision* at \*7.

Magnolia timely appealed.  We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review rulings on motions for JMOL under the law of the regional circuit.  *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1358 (Fed. Cir. 2017).  In the Third Circuit, JMOL is appropriate only where, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Gagliardo v. Connaught Lab'ys*, Inc., 311 F.3d 565, 568 (3d Cir. 2002).  Federal Circuit law applies to issues of substantive patent law, such as claim construction.  *See, e.g., Wash World Inc. v. Belanger Inc.*, 131 F.4th 1360, 1368 (Fed. Cir. 2025).

When the district court relies only on intrinsic evidence to construe a claim term, including whether claim language invokes 35 U.S.C. § 112(f), we review that construction de novo.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346 (Fed. Cir. 2015) (en banc).  To the extent that the district court, in construing the claims, makes underlying findings of fact based on extrinsic evidence, we review such findings of fact for clear error.  *Teva Phrams.*, 574 U.S. at 326–27; *Williamson*, 792 F.3d at 1346.  Clear error exists when "we are left with a definite and firm conviction that a mistake has been committed." *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016).

Magnolia makes three main arguments challenging the district court's grant of JMOL of no infringement of the '483 patent. First, Magnolia contends that the district adopted an untimely claim construction by concluding that the "vent" and "seal" limitations of the '483 patent must be met by separate structures. Open. Br. 33–38. Second, Magnolia argues that even if the district court's separate-structure construction was not untimely, the construction was incorrect. Open. Br. 38–44. Third, Magnolia asserts that JMOL was improper even when relying on the district court's separate-structure construction because the jury had sufficient evidence to support its finding of infringement under that construction. Open. Br. 44–46.

Separately, Magnolia argues that the district court erred in construing "diverter" as used in the '001 patent as a means-plus-function term. Open. Br. 48–57. We address each argument in turn.

## I. THE '483 PATENT

### A

We start with Magnolia's untimeliness argument. As noted, the parties did not ask the district court to construe the "vent" and "seal" limitations of the '483 patent. Accordingly, the jury was instructed that the terms should be given their plain and ordinary meanings as understood by a person of ordinary skill in the art. J.A. 44. In its decision granting Kurin's JMOL motion, the district court, relying on this court's decision in *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249 (Fed. Cir. 2010), concluded that because the "vent" and "seal" limitations are listed separately in claim 1, the patented invention requires two separate corresponding structures for those limitations. *JMOL Decision* at *6 (citing *Becton*, 616 F.3d at 1254 ("Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.")). And because the evidence presented at trial was

undisputed that the "vent" and "seal" limitations were met by the same structure in the Kurin Lock, the porous plug, the district court concluded that Kurin could not infringe the claims of the '483 patent as a matter of law. *Id.*; *see* J.A. 25573–74 (Magnolia expert: "[The] porous plug . . . is initially a vent" that "first allows air," and "then it seals and then it's a shut seal."), 25841 (Kurin expert: "[B]efore the porous plug has been wetted, the porous plug is a vent. Once it's been wetted, that causes the plug to swell and it becomes a seal.").

Magnolia asserts that it was too late in its JMOL decision for the district court to "announce[] . . . for the first time" that the "vent" and "seal" limitations should be construed as requiring two separate corresponding structures under *Becton*. Open. Br. 34. According to Magnolia, adopting such a construction was prejudicial because it "never had an opportunity to argue infringement under this new, fundamentally different construction to the jury." Open. Br. 47. In Magnolia's view, the issue should have been limited to whether sufficient evidence supported the jury's finding of infringement under the plain and ordinary meaning of "vent" and "seal," which includes devices with *either* separate or the same structures corresponding to those limitations. *See* Open. Br. 26–30; Oral Arg. at 8:33–43 (Court: "Your view is that because there was no specific claim construction, the jury was free to find that the vent and seal could be in the same structure?" Magnolia counsel: "Correct.").[2] And because the evidence showed that the porous plug meets the same structure construction, Magnolia contends that the jury's finding of infringement should not have been disturbed. Open. Br. 27–33.

---

[2] Oral Argument *available at* https://www.cafc.uscourts.gov/oral-arguments/24-2001_01072026.mp3.

10    MAGNOLIA MEDICAL TECHNOLOGIES, INC. v. KURIN, INC.

We disagree. Indeed, Magnolia is correct that where parties agree that the plain and ordinary meaning of a claim term applies, it is improper for the district court to adopt a materially different claim construction at JMOL. *See Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003) ("[I]t is too late at the JMOL stage to . . . adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation."). But, it is permissible for a district court to "elaborat[e]" on its construction post-verdict when it "only clarifie[s] what was inherent in the construction." *Cordis Corp. v. Bos. Sci. Corp.*, 658 F.3d 1347, 1356 (Fed. Cir. 2011). We conclude that the district court engaged in such permissible clarification here. We explain.

In *Becton*, the claim listed two limitations separately, but the accused product contained the corresponding elements within a single structure. *Becton*, 616 F.3d at 1254–56. Specifically, the claim recited: "A shieldable needle assembly comprising . . . a hinged arm . . . and spring means." *Id.* at 1254 (emphasis omitted). And there, like here, the jury was not instructed that the separately listed claim limitations meant that the claim required two separate corresponding structures. *See id.* at 1252. The district court denied the accused infringer's post-trial motion for JMOL that the jury did not have sufficient evidence to support its finding of infringement. *Id.* at 1253. We reversed, explaining that where a claim lists limitations separately, "the clear implication of the claim language is that those elements are distinct components in the patented invention." *Id.* at 1254 (cleaned up). We also looked to the specification, explaining that it "comport[ed] with the *plain language*" of the claims that the two limitations implied two separate corresponding structures in the patented invention. *Id.* at 1255. (emphasis added). Because the accused product did not have separate structures

corresponding to the two claim limitations, it could not infringe as a matter of law. *Id.* at 1257.

*Becton* thus stands for the proposition that when claim limitations are separately listed within a claim, that implies that the claim's *plain and ordinary meaning* requires separate corresponding structures. *Id.* at 1254. In *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, we confirmed that *Becton* merely expounded upon the plain and ordinary meaning of a claim with separately listed limitations. *See* 130 F.4th 1372, 1378–79 (Fed. Cir. 2025) (determining that the "plain language" of a claim with four separately listed components established the "clear implication" that the components are distinct in the patented invention under *Becton*").

The district court here thus did not impermissibly "announce . . . for the first time" that the "vent" and "seal" limitations should be construed as requiring two separate corresponding structures in granting Kurin's JMOL of no infringement. *See* Open. Br. 34. Rather, by adhering to the plain and ordinary meaning of claim 1, the construction agreed upon by the parties, the district court, as we detail below, "only clarified what was inherent in the construction" under *Becton*. *Cordis*, 658 F.3d at 1356. Magnolia's claims of prejudice are therefore unwarranted—it was always incumbent upon Magnolia to provide a theory of infringement in accord with the plain and ordinary meaning of claim 1.

B

We now turn to whether the district court correctly determined the "vent" and "seal" limitations of claim 1 to require separate corresponding structures under *Becton*. We conclude that it did. Claim 1 of the '483 patent reads as follows:

A blood sequestration device, comprising:

12      MAGNOLIA MEDICAL TECHNOLOGIES, INC. v. KURIN, INC.

> a housing having an inlet port configured to be fluidically coupled to a patient and an outlet port configured to be fluidically coupled to a sample reservoir;
>
> a fluid reservoir disposed in the housing and at least partially defined by *a seal member*, the fluid reservoir configured to receive an initial volume of blood withdrawn from the patient; and
>
> *a vent* disposed in the housing and configured to allow air to exit the housing as blood enters the fluid reservoir,
>
> the blood sequestration device configured to allow the initial volume of blood to flow from the inlet port to the fluid reservoir,
>
> the blood sequestration device further configured to allow a subsequent volume of blood to flow from the inlet port toward the outlet port via a sampling flow path, thereby bypassing the fluid reservoir and the initial volume of blood sequestered therein.

'483 patent col. 20, ll. 48–65 (emphases added).

The text and structure of claim 1 demonstrate the separateness of the "vent" and "seal" limitations. First, when a claim is written in the "comprising . . . a" format, the article "a" means "one or more than one." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999). Here, claim 1 uses the transitional phrase "comprising," and both the "vent" and "seal" limitations are preceded by the word "a," *see* '483 patent col. 20, ll. 52–57, meaning that one or more of each structure is required in the patented invention. *Elkay* 192 F.3d at 977; *see also Becton*, 616 F.3d at 1254 (separate-structure implication applied even though second structure not preceded by "a"). Second, just as in

*Becton*, the two limitations are connected by the word, "and," suggesting that the "vent" structure is in addition to, *i.e.*, separate, from the "seal" structure. '483 patent col. 20, ll. 52–58. Nothing in the text of claim 1 is to the contrary. *Becton*, 616 F.3d at 1255 ("There is nothing in the asserted claims to suggest that the [two separately listed limitations] can be the same structure."). The *Becton* implication therefore applies.

The specification is consistent with the separate-structure construction. The two limitations are described together only once, and as separate structures. Specifically, the specification provides that a "first plunger 255" forms a "substantially fluid tight seal with the inner surface of the walls," while the "vents 214 . . . can allow the air to exit the portion of the inner volume" of the housing. '483 patent col. 13, ll. 22–29; *cf. Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231–32 (Fed. Cir. 2011) (specification's disclosure that one structure "may also function" as another structure "cut[] against" argument that two limitations should be construed to require two separate structures). The district court therefore correctly concluded that the plain and ordinary meaning of claim 1 requires separate corresponding structures for the "vent" and "seal" limitations under *Becton*. *JMOL Decision* at *6–7.

Magnolia's primary argument against the application of *Becton* is based on the doctrine of claim differentiation. Under that doctrine, "it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims." *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000). Magnolia points to dependent claim 6, which recites: "[t]he blood sequestration device of claim 1, wherein *the seal members* [are] configured to prevent the flow of air through *the vent* into the fluid reservoir." '483 patent col. 21, ll. 8–10 (emphases added). According to Magnolia, claim 1 "cannot require the vent and seal to be separate components" or else claim 6's separate "vent" and

14    MAGNOLIA MEDICAL TECHNOLOGIES, INC. v. KURIN, INC.

"seal" limitations would lack "any meaning" beyond what is recited in claim 1.  Open. Br. 42.

We are not convinced.  Although the "vent" and "seal" are explicitly recited as separate structures in claim 6, that does not mean that claim 1 must be broader in that respect and therefore include the situation in which "vent" and "seal" are not separate.  A dependent claim may focus on one limitation of a broader claim that has multiple claim limitations and not be forced to be broader than the claim from which it depends from in all respects.

Moreover, claim 6 does not cover every configuration in which the "vent" and "seal" are separate structures.  Rather, it merely specifies one way in which the two limitations interact with one another, requiring the "seal" to prevent air flow through the "vent."  *See* '483 patent col. 21, ll. 8–10.  Therefore, claim 6's recitation of separate "vent" and "seal" structures does not require claim 1 to permit the limitations to be met by the same structure for claim 6 to have independent meaning.

C

Magnolia's last argument in challenging the district court's grant of JMOL is that the jury had sufficient evidence to find infringement even under the separate-structure construction of the "vent" and "seal" limitations.  Open. Br. 44–46.  Magnolia contends that a different part of the Kurin Lock, the umbrella-valve, operates as a "seal" while the porous plug satisfies the "vent" requirement.  Open. Br. 44–46.  But Magnolia did not present this theory of infringement to the jury.  We accordingly will not consider the argument.  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) (declining to consider new infringement argument that was not first presented to the trial court).

II. The '001 Patent

We last address Magnolia's argument that the district court erred in construing "diverter" as used in the '001 patent to be a means-plus-function term.

Claim 1 of the '001 patent reads as follows:

An apparatus for obtaining a bodily fluid sample from a patient with reduced contamination, the apparatus comprising:

> a reservoir configured to receive an initial volume of bodily fluid withdrawn from the patient; and
>
> a *diverter* having an inlet, a first outlet in fluid communication with the reservoir, and a second outlet, the inlet configured to be fluidically coupled to the patient, the *diverter* operable in a first operating mode in which an initial volume of bodily fluid can flow from the inlet to the first outlet, and a second operating mode in which: a) a subsequent volume of bodily fluid can flow from the inlet to the second outlet, and b) the initial volume of bodily fluid is prevented from flowing to the second outlet,
>
> the *diverter* configured to transition from the first operating mode to the second operating mode as a result of the initial volume of bodily fluid flowing from the patient and substantial pressure equalization, thereby sequestering in the reservoir contaminants present in the initial volume of bodily fluid, thereby reducing contamination of the subsequent volume of bodily fluid withdrawn from the patient.

'001 patent col. 11 ll. 10–32 (emphases added).

16    MAGNOLIA MEDICAL TECHNOLOGIES, INC. v. KURIN, INC.

At claim construction, Magnolia argued that claim 1 recited sufficient structure to perform the function of the recited "diverter." J.A. 1359–63, 1368–77. Kurin disagreed, asserting that an additional structural mechanism was also required to perform the function of the "diverter." J.A. 1363–68. The district court agreed with Kurin, concluding that a person of ordinary skill in the art would not understand claim 1 to recite sufficient structure for performing the function of the recited "diverter," and therefore it should be construed as a means-plus-function claim limited to the corresponding structures in the specification. *Markman Decision* at *3–5. Magnolia did not, nor does it here, argue that the specification disclosed corresponding structures that were in the Kurin Lock. Based on that construction, the parties stipulated that the Kurin Lock does not infringe the asserted claims of the '001 patent. J.A. 25–26.

We conclude that the district court did not err in determining "diverter," as used in the '001 patent, to be a means-plus-function term.

Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes 35 U.S.C. § 112(f), which states:

An element in a claim for a combination may be expressed as *a means or step for performing a specified function without the recital of structure*, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

(emphasis added).

Under our *en banc* decision in *Williamson*, the first inquiry in determining whether a claim term invokes § 112(f) is whether the claim limitation uses the word "means." 792 F.3d at 1348. "If so, there is a rebuttable presumption that § 112[(f)] applies; if not, there is a rebuttable

presumption that the provision does not apply." *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1298 (Fed. Cir. 2018) (citing *Williamson*, 792 F.3d at 1348–49). Where, as here, the claim limitation does not use the word "means," the presumption that § 112(f) does not apply will be overcome "if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349 (cleaned up). The "essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348.

Magnolia and Kurin agree that the functionality of the recited "diverter" is to "direct[] bodily fluid down one of two paths." Open. Br. 48 (A diverter "diverts or directs bodily fluid down one of two paths."); Resp. Br. 63 (adopting Magnolia's stated functionality of the "diverter"). For the presumption that § 112(f) does not apply to be overcome, Kurin must show that claim 1 does not recite sufficient structure to perform that function. Kurin has done so.

It is true that claim 1 recites some structural elements of the "diverter." It first recites an "inlet configured to be fluidically coupled to [a] patient," *i.e.*, an inlet that receives bodily fluid from the patient. '001 patent col. 11, ll. 16–17. It also recites two "outlet[s]," both of which are connected to the "inlet." The first "outlet" receives "an initial volume of bodily fluid from the inlet," *id.* at col. 11, 19–20, and the second "outlet" receives "a subsequent volume of bodily fluid from the inlet." *Id.* at col. 11, ll. 21–22.

As is evident, however, neither the "inlet" nor the two "outlet[s]" are structures that direct the bodily fluid down one of two paths. Rather, the structures operate passively, by receiving and facilitating the flow of bodily fluid through a defined path. *See id.* at col. 11, ll. 19–22. That reading

18    MAGNOLIA MEDICAL TECHNOLOGIES, INC. v. KURIN, INC.

of claim 1 is bolstered by the specification, which only depicts "diverter[s]" capable of directing the bodily fluid down one of two paths with additional structures to the recited "inlet" and two "outlet[s]." *See id.* col. 2, ll. 43–54 (describing Figures 6 and 7, which depict diverters with structural mechanisms in addition to an "inlet" and "two outlet[s]"). Accordingly, without additional structure, claim 1 is alone insufficient to perform its directing function, rebutting the presumption that claim 1's lack of the word "means" does not invoke § 112(f).

Magnolia does not meaningfully dispute the above. Rather, Magnolia contends that the "inlet" and "outlet[s]," when taken *collectively*, are sufficient to perform the functionality of the "diverter" limitation, without the need for additional structure, and therefore the presumption that § 112(f) does not apply has not been rebutted. *See* Open. Br. 49–50. In support, Magnolia primarily relies on the report prepared by its expert, Dr. Juan Santiago, in which he opined that a person of ordinary skill would understand the "inlet" and "outlet[s]" recited in claim 1, taken together, to be sufficient structure to perform the function of the recited "diverter." *See* J.A. 1454–59. The highlight of that report is Dr. Santiago's statement that a person of ordinary skill would understand a "diverter" that directs flow down one of two paths to include "at least one inlet and two outlets branches." J.A. 1454. But that statement undermines, rather than supports, Magnolia's argument that the presumption against § 112(f) has not been overcome.

It does so because *all* "diverter[s]" in this context include "at least" one "inlet" and two "outlet[s]"; the issue is whether an additional structure is needed to direct fluid down one of two paths. *See* J.A. 1454. Dr. Santiago's statement is therefore an admission that the term "diverter" would not be understood by a person of ordinary skill to have a "sufficiently definite" structural meaning, *see Williamson*, 792 F.3d at 1348, but rather as a generic term that captures any structure that performs that function.

*See Diebold*, 899 F.3d at 1300–01 (concluding that expert testimony that a person of ordinary skill would understand a claim term "to be *any* structure capable of performing the claimed function" was insufficient to establish that the claim term has sufficiently definite meaning). Accordingly, the district court did not err in construing "diverter" as used in claim 1 to be a means-plus-function term, invoking § 112(f).

## CONCLUSION

We have considered Magnolia's remaining arguments but find them unpersuasive. For the reasons provided, we affirm the decision of the district court.

**AFFIRMED**